# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CLIFTON BELL, GREGORY HYDE, GARRISON SCHRUM, and MATTHEW ROSS, on behalf of themselves and all others similarly situated, | No. 60660-7-II |
| Appellants, | |
| v. | |
| WASHINGTON STATE DEPARTMENT OF CORRECTIONS, a state agency, | UNPUBLISHED OPINION |
| Respondent. | |

GLASGOW, J.—Several incarcerated plaintiffs challenge the Department of Corrections' use of "presumptive" colorimetric drug tests to punish them for alleged drug possession. The Department performs these tests by swabbing incarcerated people's possessions; for example, mail or papers found in their cells. The plaintiffs allege that although these tests are widely known to be highly inaccurate and susceptible to false positives, the Department imposes punishments based on the test results without confirming them in a laboratory. In some cases, laboratory tests have demonstrated that people were punished based on false positives. The plaintiffs allege that after finding incarcerated people guilty of drug possession on the basis of unreliable colorimetric tests, the Department has punished them with significant sanctions, including solitary confinement and lost good time credits, sometimes causing delayed release from prison.

The plaintiffs brought this class action lawsuit against the Department seeking declaratory and injunctive relief and damages for the use of colorimetric drug tests as a basis for prison discipline without confirmation of the results with a reliable laboratory test. Plaintiffs allege violations of the due process and cruel punishment clauses of the Washington State Constitution; intentional infliction of emotional distress (outrage); violation of the Department's duty to protect incarcerated people's health, safety, and welfare; negligence; and negligent infliction of emotional distress. They seek declaratory and injunctive relief based on the constitutional claims and damages based on both the constitutional claims and the tort claims.

The Department brought motions under CR 12(b)(6) and CR 12(c) seeking judgment on the pleadings. The trial court dismissed all of the plaintiffs' claims as a matter of law. It determined that the plaintiffs could not bring their injunctive and declaratory relief claims in a class action lawsuit but must instead proceed through individual personal restraint petitions (PRP); that the plaintiffs failed to state a claim for any tort; and that constitutional damages claims are not viable in Washington state. The plaintiffs appeal.

Applying the standard for evaluating motions to dismiss under CR 12(b)(6) and CR 12(c) and assuming, as we must, that the plaintiffs' allegations are all true, we conclude that the plaintiffs' allegations were sufficient, for CR 12(b)(6) and CR 12(c) purposes, to state claims for injunctive and declaratory relief based on constitutional violations; outrage; and negligent infliction of emotional distress. The Department has failed to establish that these claims must be dismissed as a matter of law. We affirm the trial court's dismissal of the plaintiffs' remaining claims and its decisions to defer the plaintiffs' motion on class certification and to stay discovery. We otherwise reverse and remand for further proceedings consistent with this opinion.

FACTS

I. THE DEPARTMENT'S USE OF COLORIMETRIC DRUG TESTS IN PRISON DISCIPLINE

Because this appeal arises from the dismissal of the plaintiffs' complaint based on CR 12(b)(6) and CR 12(c), we must assume all allegations in the complaint are true and also consider hypothetical facts conceivably raised by the complaint. *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 180 Wn.2d 954, 962, 331 P.3d 29 (2014); *P.E. Sys., LLC v. CPI Corp.,* 176 Wn.2d 198, 210-11, 289 P.3d 638 (2012). We therefore recite the plaintiffs' allegations assuming they are true at this stage.

The Department of Corrections used colorimetric tests, sometimes called presumptive drug tests, within its facilities as a tool to detect illegal drugs.[1] These tests involve swabbing an object "believed to contain . . . drug residue, inserting the swab into a test pouch containing . . . chemical reagents, and waiting to see what color the test strip" turns. Clerk's Papers (CP) at 15. The Department screened incarcerated people's mail and "conducted random or targeted cell searches of incarcerated individuals' possessions," sometimes testing those items with colorimetric tests. *Id.*

The Department explained that it has "experience[d] a substantial increase in dangerous drugs being introduced" into its prisons. CP at 80. The Department alleged that illegal drugs are being "liquefied and sprayed onto paper," sent into its prisons through the mail, and then

---

[1] In the briefs, the parties cite to facts and evidence in the record beyond the pleadings. But to comport with the trial court's decision not to convert the Department's motion for judgment on the pleadings to a summary judgment motion, which is not challenged on appeal, we recite the facts based only on allegations in the pleadings, attachments to the pleadings, and public documents. *See Wash. State Hum. Rts. Comm'n v. Hous. Auth.*, 21 Wn. App. 2d 978, 983, 509 P.3d 319 (2022).

"subdivided into . . . doses and distributed." *Id.* It identified colorimetric tests as "a tool to address this significant problem[] and mitigate harm to the incarcerated population and staff." *Id.*[2]

Plaintiffs Clifton Bell, Matthew Ross, and Garrison Schrum brought this lawsuit to challenge the Department's use of positive results from colorimetric testing as a basis for imposing disciplinary sanctions on incarcerated people.[3] The plaintiffs alleged that colorimetric tests "are highly unreliable and intended to be used as an initial screening test only." CP at 4 (emphasis omitted). They alleged that the Department failed to "corroborate allegedly positive results with confirmatory laboratory testing" as directed by the manufacturers' instructions for the tests. *Id.* Additionally, colorimetric tests are "only intended to be used on substances like liquids, pills, or powders" and are "not designed to be swabbed on paper or mail." CP at 7. The plaintiffs explained that "the reagents in the tests can react to trace chemicals commonly found on paper products[] the same way they would react to the chemicals used to create synthetic drugs," resulting in false positives. *Id.*

The Department regularly tested incarcerated individuals' personal belongings, mail, and papers for synthetic cannabinoids, commonly known as "spice." Spice "can be derived from combinations of hundreds of different chemicals," and "because the synthetic composition of

---

[2] This explanation was provided in a letter to plaintiffs' counsel that the plaintiffs then included as an attachment to their complaint.

[3] Originally, there was a fourth named plaintiff in this case, Gregory Hyde, as reflected in our case caption. In May 2024, Columbia Legal Services withdrew from representing Hyde citing "ethical considerations." 3 Verbatim Rep. of Proc. at 142. Hyde remained a plaintiff but was unable to secure a new attorney by the time the trial court dismissed the case in August 2024. Hyde is not a party to this appeal.

[s]pice is so varied and the compounds . . . can change so rapidly," colorimetric tests are not capable of serving as an accurate test to detect spice. CP at 5.

The plaintiffs also alleged the Department knew or should have known that the tests are unreliable. A Massachusetts trial court enjoined the use of similar tests. That court concluded the accuracy of the test results was "'only marginally better than a coin[-]flip[.]'" CP at 7 (second alteration in original) (quoting *Green v. Mass. Dep't of Corr.*, No. 2184CV02283, slip op. at 8 (Suffolk Super. Ct., Mass. Nov. 30, 2021) (court order) [https://perma.cc/26CJ-MM4F]). And Department staff "openly joke[d] about the inaccuracy of the tests and sometimes test[ed] common items in their possession to see if they w[ould] test positive to amuse themselves." CP at 8. The plaintiffs alleged that Department staff sometimes tested incarcerated individuals' belongings with colorimetric tests "for retaliatory purposes." CP at 10.

The Department admitted in its answer that it was aware that the manufacturers' labels on at least some of the colorimetric tests the Department used provided warnings "that false positive and false negative results [could] occur and that results should be confirmed by laboratory testing." CP at 101. The Department admitted it was also aware that some items available from prison commissaries "could provide a false positive result, including certain oils, glue on envelopes, Visine, and an over-the-counter allergy medication." *Id.*

The Department admitted that it has imposed a variety of disciplinary sanctions on incarcerated people based on positive colorimetric test results, including revoking good time credits; revoking privileges such as recreation and the right to receive packages; loss of work opportunities; "cell confinement"; and added work duty. The Department admitted it has also used drug possession violations as the basis for changing incarcerated people's custody levels (for

5

instance, from "minimum to medium custody"), which resulted in people being transferred to other facilities. CP at 109. And applying its administrative segregation policy, the Department admitted it has placed individuals found in possession of drugs based on colorimetric tests in solitary confinement, sometimes for months at a time, during the pendency of their investigations.

"Solitary confinement" is the practice of confining an individual "to a single-occupancy cell for more than 20 hours a day without meaningful human contact, out-of-cell activities, or opportunities to congregate." CP at 1781.[4] The plaintiffs allege that solitary confinement causes significant physical and psychological harm, and that the United Nations "has recognized more than 15 consecutive days in solitary confinement for 22 hours or more per day as torture." CP at 8.

Significantly, the Department has acknowledged that solitary confinement can cause "physical damage[,] . . . the development of health problems, and potential consequences for mental health and general well-being," including "increased risk for self-directed violence and suicide," as well as "slowed brain activity and neurological damage." CP at 1778. Accordingly, in 2023 the Department released a plan to reduce usage of solitary confinement by 90 percent after "more than a decade of work . . . to reduce reliance on" the practice. CP at 1764.[5]

---

[4] This definition comes from the Department's 2023 "Solitary Confinement Transformation Project" report, which the plaintiffs attached to a declaration supporting their opposition to the Department's motion to dismiss. CP at 1762-1921. Because this is a publicly available document created by a state agency it is appropriate for us to consider it without converting the Department's motion to a summary judgment motion. *See Wash. State Hum. Rts. Comm'n*, 21 Wn. App. 2d at 983.

[5] The Department objects to the plaintiffs' broad use of the term "solitary confinement" to describe different types of segregation from the general population and states that it does not use that term "in reference to discipline." Resp't's Br. at 26. In particular, the Department distinguishes "administrative segregation," in which "[a] person . . . is moved or transferred to a secured higher-level facility due to [an] increased safety or security risk, their movements are always escorted,

Until 2023, the Department typically did not permit incarcerated people who received infractions based on colorimetric tests results to obtain confirmatory laboratory testing. Although the Department has since changed its policy to allow incarcerated people the opportunity to request lab testing, as discussed in more detail below, the plaintiffs allege in their briefing that the Department continues to refuse "to submit [colorimetric] tests for lab testing" in at least some cases. Appellants' Reply Br. at 3.

## II. FACTS RELATED TO NAMED PLAINTIFFS

A.      Clifton Bell

In March 2022, correctional officers searched Clifton Bell's cell and found a scrap of paper on or near his shoe, which they tested for drugs using a colorimetric test. The test returned a presumptive positive result for spice. Bell received an infraction and was immediately placed in solitary confinement under the Department's administrative segregation policy. At his April infraction hearing, the Department found Bell guilty and sanctioned him with 75 days of lost good time credits, among other things, without confirming the results of the colorimetric test with laboratory testing. Bell appealed his infraction and requested a laboratory test to confirm the positive result from the colorimetric test. The department denied Bell's request for confirmatory testing and upheld the infraction on appeal.

---

their programming and visitation is limited, and meals are served in the individual's cells," from "cell confinement," which is "an available punishment for serious violations" where "the individual remains in their home facility and in their assigned room[,] . . . except to go to work, school, religious services, visits, meals, and the law library." Resp't's Br. at 26-27. In its 2023 Solitary Confinement Transformation Project report, the Department admits that administrative segregation units are "presumed to operate under solitary confinement protocols." CP at 1782. In any event, at this stage we must presume that all allegations in the plaintiffs' complaint are true, including as they relate to being punished with placement in solitary confinement as the plaintiffs understand the term.

On April 25, 2022, the same day that Bell appealed this first infraction, the same correctional officers who had tested the paper on Bell's shoe used colorimetric tests on three greeting cards that a loved one, Lyndsay Gardiner, had sent to Bell. The Department alleges that it had received reports from "confidential informants" that Bell was working with Gardiner to bring drugs into the prison. CP 107. The cards tested presumptively positive for phenethylamine, a prohibited drug. Neither Bell nor Gardiner had ever touched the cards, which were sent directly from a large United Kingdom-based greeting card company and had not yet been delivered to Bell. Bell received another infraction based on these test results.

Gardiner contacted the Department, explaining that the greeting cards were ordered and sent directly from an online retailer. As a result, the Department suspended Bell's infraction and submitted the greeting cards for confirmatory testing. The laboratory tested the greeting cards and found that they did not contain drugs. Bell's infraction related to the greeting cards was expunged from his record. The Department did not review Bell's previous infraction related to the piece of paper from his shoe or conduct confirmatory testing in that case. Bell estimates that he spent a total of four months in solitary confinement because of these infractions.

B.    Matthew Ross

In November 2022, corrections officers searched Matthew Ross' cell and found a letter that Ross had received from his friend, a college librarian. The officers tested the letter for drugs with a colorimetric test, which returned a presumptive positive result for spice. Ross received an infraction and was sanctioned with 30 days of cell confinement and 45 days of lost good time credits, among other things. Ross' loss of good time credits changed his release date from September 2, 2023, to October 17, 2023. Ross appealed, and the Department upheld his infraction.

In August 2023, officers again searched Ross' cell, this time seizing paperwork that included legal mail from Columbia Legal Services. Department staff allegedly informed Ross that some of the papers had tested positive for drugs and that it may have been his legal paperwork. Ross received another infraction based on this result.

Ross' attorney at Columbia Legal Services contacted the Department and learned that the seized papers that had returned a presumptive positive drug test result, were copies of Ross' immunization records and high school transcripts sent by Ross' mother. Ross claims that the Department had asked him to have those documents sent. On September 7, 2023—five days after his original release date, which had been delayed due to his first infraction—the Department abruptly released Ross from custody and returned the legal mail and paperwork it had seized from him.

C.      Garrison Schrum

In June 2022, corrections officers searched Garrison Schrum's cell and tested scraps of paper they found there with colorimetric tests. The tests returned a presumptive positive result for spice. Schrum received an infraction and was placed in solitary confinement for two weeks leading up to his hearing. Before his hearing, Schrum requested laboratory confirmation testing. The Department denied the request.

The Department found Schrum guilty at his hearing and sanctioned him with 30 days of lost good time credits and 30 days of "solitary confinement to his cell," among other things. CP at 25. Schrum immediately appealed, and the Department upheld his infraction. The plaintiffs allege

that Schrum's good time credits were eventually restored after he remained infraction-free for the ensuing year.[6]

III. PROCEDURAL HISTORY

A.     Threat of Litigation

Bell, Ross, Schrum, and a fourth incarcerated person, Gregory Hyde, retained Columbia Legal Services to challenge the Department's use of colorimetric tests to punish them. In August 2023, Columbia Legal Services sent a letter informing the Department that Columbia Legal Services intended to file a class action lawsuit on behalf of its clients and sought to discuss an out-of-court resolution.

In response to the threatened litigation, the Department sent a letter to its staff in September 2023 announcing that "[e]ffective[] immediately, the use of Presumptive Drug Testing . . . will NOT be the sole determining factor of guilt in WAC violations . . . for drug possession." CP at 82 (boldface omitted). The Department clarified that its "Presumptive Drug Testing Policy" would "be revised . . . to . . . allow an incarcerated individual the opportunity to request laboratory confirmation, if possible, for presumptive positive tests prior to an infraction hearing for drug possession." *Id.* The announcement also stated that the Department would "review drug possession infractions issued over the last two years to determine whether any infractions" were unsupported

---

[6] Included in the appellate record is a declaration from Dr. Terry Kupers, a psychiatrist. The declaration was originally attached not to the complaint but to the plaintiffs' response to the Department's CR 12(c) motion. The declaration describes in detail the mental and physical health effects that each plaintiff suffered as a result of their time in solitary confinement. Because we are reviewing a motion for judgment on the pleadings, we do not consider the contents of this report in our analysis. But again, we assume all of the facts alleged in the complaint are true.

by corroborating evidence and should therefore "be expunged along with restoration of any resulting loss of good conduct[] . . . time." *Id.*

Columbia Legal Services told the Department that its "newly announced policy [was] insufficient to protect the rights of those in custody" and failed to "compensate those . . . who were punished" based on colorimetric test results. CP at 84. Thus, the Department's change of policy did not resolve the plaintiffs' claims.

B.      Initial Pleadings

Bell, Hyde, Schrum, and Ross filed a class action lawsuit in September 2023. The plaintiffs alleged facts consistent with those described above. They asserted that the Department's uncorroborated use of colorimetric tests to support prison discipline sanctions violated their state constitutional rights to due process and to be free from cruel punishment. The plaintiffs also brought several common-law tort claims. They alleged that the Department violated its "duty to protect and maintain the health, safety, and welfare of the Plaintiffs." CP at 32. They brought general negligence and negligent infliction of emotional distress claims. In addition, the plaintiffs brought a claim for intentional infliction of emotional distress, alleging that the Department's "intentional[] or reckless[]" conduct was "extreme and outrageous" and "caused . . . severe emotional distress." CP at 32.

The plaintiffs requested declaratory and injunctive relief ordering the Department to stop the allegedly unconstitutional "actions, customs, conditions, policies, and practices described in" the complaint; monetary damages for their common-law tort claims and their constitutional claims; an order requiring the Department to expunge all records of colorimetric test results and restore good time credits that it revoked based on unconfirmed results; attorney fees and costs; and any

other relief that "justice may require." CP at 32-33. Although the plaintiffs sought restoration of improperly revoked good time credits, the complaint does not include a request for release from confinement as a remedy.

In its answer to the complaint, the Department made the admissions described above. The Department also raised several affirmative defenses: that the "[p]laintiffs [] failed to state a claim upon which relief may be granted," that the "[p]laintiffs' claims are moot," that the "[p]laintiffs' claims seeking restoration of good conduct time are cognizable only in a personal restraint petition," that the Department's actions could not be negligent because they were "a reasonable exercise of judgment and discretion by authorized public officials," and that the Department "is immune from suit." CP at 114.

C.      Dismissal of Constitutional Damages Claims and Deferral of Class Certification

The Department moved under CR 12(b)(6) to dismiss the plaintiffs' claims for damages based on state constitutional violations. It argued that in the absence of legislation directing courts to allow state constitutional damages claims, no such cause of action exists. It also argued that sovereign immunity protects Washington State agencies from such claims. Around the same time, the plaintiffs moved for class certification. They requested that the court certify a class under both CR 23(b)(2)—which sets out the requirements for an injunctive class action—and CR 23(b)(3)—which sets out the requirements for a class action for damages. In January 2024,[7] the trial court heard argument on both motions.

---

[7] The caption to the verbatim report of proceedings incorrectly lists the date of this hearing as 2023.

The trial court dismissed the constitutional damages claims. It relied on article II, section 26 of the Washington State Constitution, which states, "The legislature shall direct by law, in what manner, and in what courts, suits may be brought against the state." After considering the statutory waiver of sovereign immunity in RCW 4.92.090, the trial court concluded "that there is not an express or an implied cause of action" for damages for violations of the state constitution. 2 Verbatim Rep. of Proc. (VRP) at 109. The plaintiffs' tort claims and requests for injunctive and declaratory relief remained.

Arguing against the motion for class certification, The Department claimed the plaintiffs lacked standing to bring a class action. It noted that the plaintiffs were challenging prison discipline decisions that revoked good time credits and thus "affect[ed] the duration of . . . confinement." 2 VRP at 85. In the Department's view, incarcerated people can challenge the duration of their confinement only through individual habeas corpus petitions or personal restraint petitions (PRPs).

The plaintiffs characterized the Department's argument as a "de facto motion to dismiss" that failed to "address any of the [class certification] requirements of CR 23." 2 VRP at 76. The plaintiffs told the trial court that they lacked adequate space in their reply brief to address both the requirements of CR 23 and the Department's arguments. The plaintiffs explained they were only prepared to argue the CR 23 requirements.

The trial court deferred ruling on class certification for four months and invited the Department to bring a motion to dismiss so that both parties could brief the issue of whether the plaintiffs' claims could only be brought as habeas petitions or PRPs.

D.      Formal Adoption of New Drug Testing Policy

It is uncontested that the Department eventually codified its policy change with regard to colorimetric drug tests in February 2024, a few months after the plaintiffs filed their complaint. Under the updated "Presumptive Drug Testing" policy, "[a]n individual in total/partial confinement *may request* laboratory confirmation" of a positive or abnormal colorimetric test. CP at 1633 (emphasis added). The policy also maintains that "[i]f the test results are confirmed positive by the laboratory, the individual will reimburse the Department for testing costs" and that "[t]he individual will be notified if a contracted laboratory is not available." *Id.* Under the policy, "[r]esults of presumptive testing kits may be the sole factor when determining guilt for possessing or introducing drugs/alcohol by individuals in total/partial confinement only when the results have been confirmed by a contracted laboratory." *Id.* The policy also provides that if the results are not confirmed, additional evidence is required to support the violation; for example, "refusal of confirmation laboratory testing, statement by individual or witness, confidential information, positive urinalysis test, use of a canine, medical response, [or] paraphernalia." *Id.*

The updated policy does not say that presumptive tests could not be relied upon at all absent a confirmatory laboratory test or refusal of a confirmatory laboratory test. The plaintiffs allege in their briefing that the Department "has not followed its new policy" and continues to impose punishments without submitting colorimetric tests for laboratory confirmation. Appellants' Reply Br. at 3.

E.      CR 12(c) Motion for Judgment on the Pleadings

In April 2024, the Department filed a motion for judgment on the pleadings under CR 12(c). The Department renewed its argument from the class certification hearing that the plaintiffs'

challenges to "prison disciplinary decisions that affect the duration and conditions of their confinement" could only be brought in individual habeas corpus actions or PRPs. CP at 696. The Department further claimed that as a matter of law, the plaintiffs failed to state any tort claims that could be granted. And it argued that the plaintiffs' claims for injunctive and declaratory relief were moot because of the Department's announced policy change that would allow people who received drug infractions to request laboratory confirmation.

In response, the plaintiffs pointed out that PRPs could not provide relief in the form of damages, and those who had already been released from custody may not be eligible to file a PRP. The plaintiffs also opposed dismissal of their tort claims, arguing that the Department's concerns were better characterized as factual disputes that could not be disposed of on a motion for judgment on the pleadings.

F.    Stay of Discovery

In May 2024, the trial court heard a motion from the Department to stay additional discovery pending the trial court's ruling on the motion to dismiss. The Department argued that a stay was appropriate because the motion to dismiss was dispositive and that a stay would not prejudice the plaintiffs because the motion to dismiss addressed "only legal issues that don't require discovery." 3 VRP at 126.

The plaintiffs responded that the Department had not shown that the additional requested discovery would be "burdensome or prejudicial." 3 VRP at 131. The plaintiffs further explained that the discovery they sought was "intended to understand [the Department]'s past practice with [colorimetric] tests to understand the potential scope of future harm" and to determine whether the Department was adhering to its announced policy change. 3 VRP at 133.

15

The trial court stated that it had taken a "threshold look" at the pending motion for judgment on the pleadings and agreed with the Department that the motion presented a "narrow question of law" that would not "require consideration of . . . things outside the record." 3 VRP at 142-43. The trial court stayed discovery until it ruled on the CR 12(c) motion.

G.     Trial Court Ruling on CR 12(c) Motion for Judgment on the Pleadings

The trial court heard the Department's motion for judgment on the pleadings in August 2024. The trial court explicitly declined to consider evidence outside of the pleadings or convert the CR 12(c) motion into a motion for summary judgment. The trial court explained that it intended to "keep[] [its] examination of the legal issue narrow" and that "the utility of the materials submitted by the plaintiffs are for the court to have more imagination about what are conceivable facts without accepting them as true but accepting them as provable at this juncture." 1 VRP at 18. The trial court did not say specifically what additional facts it was referring to.

The trial court granted the Department's motion for judgment on the pleadings as to all of the plaintiffs' claims. In dismissing the plaintiffs' outrage claim, the trial court relied entirely on the reasoning from *Khalif v. McKenzie*, [8] a Division Three opinion.[9] It stated that "for similar reasons [to *Khalif*] there is no claim here given the challenge to prison discipline and the drug testing being connected to individual punishment decisions." 1 VRP at 42-43. The trial court next dismissed the negligence and negligent infliction of emotional distress claims on the basis that a

---

[8] No. 38045-9-III, slip op. (Wash. Ct. App. Feb. 1, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/380459_unp.pdf

[9] The transcript for this hearing refers to the case as "KAY LISS." 1 VRP at 43. The plaintiffs state, and the Department does not dispute, that this is a clerical error and the trial court was actually referring to *Khalif*.

prison's duty to incarcerated people is a "special relationship . . . to protect from physical harm" only. 1 VRP at 43.

The trial court also ruled that the plaintiffs' remaining constitutional injunctive relief claims "need[ed] to be exclusively the subject of [PRPs] or habeas corpus relief requests" and therefore the court dismissed them as a matter of law. 1 VRP at 45 (emphasis omitted). The trial court reached its conclusion based on the Washington Supreme Court's decisions in *Kozol v. Wash. State Dep't of Corr.*,[10] *Colvin v. Inslee*,[11] and *In re Pers. Restraint of Williams*[12]:

> [T]he discussion back and forth between the majority and the dissent [in *Colvin*] seemed to suggest that the dicta from the state Supreme Court justices is that they contemplate this type of cause of action being the subject of a PRP and habeas corpus, that it would be adequate. That doesn't directly address whether it's exclusive, but the court believes in reading together *Kozol*, *Colvin [v.] Inslee* and *In re Williams* that they all direct the court to the likely outcome that the appellate courts would say a challenge like what is brought here is a challenge to an individual discipline decision and it needs to be advanced by a personal restraint petition or a habeas corpus petition.

1 VRP at 44 (emphasis omitted). The court explicitly did not address whether any of the plaintiffs' claims were moot.

In sum, the trial court ultimately dismissed all of the plaintiffs' claims and therefore dismissed the lawsuit.

The plaintiffs appeal the dismissal of their constitutional damages claims under CR 12(b)(6) and their remaining claims under CR 12(c). They also assert that the trial court abused its discretion by deferring determination of their motion for class certification and by staying discovery.

---

[10] 185 Wn.2d 405, 379 P.3d 72 (2016).
[11] 195 Wn.2d 879, 467 P.3d 953 (2020) (plurality opinion).
[12] 198 Wn.2d 342, 496 P.3d 289 (2021).

ANALYSIS

I. TYPE OF MOTION AND STANDARD OF REVIEW

We review a trial court's dismissal of a claim under CR 12(b)(6) or CR 12(c) de novo. *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007); *P.E. Sys.,* 176 Wn.2d at 203. "We treat a CR 12(c) motion for judgment on the pleadings identically to a CR 12(b)(6) motion to dismiss for failure to state a claim." *P.E. Sys.*, 176 Wn.2d at 203. Washington has "'liberal rules of pleading [that] require a complaint to contain direct allegations sufficient to give notice to the court and the opponent of the nature of the plaintiff's claim.'" *Champagne v. Thurston County*, 163 Wn.2d 69, 85, 178 P.3d 936 (2008) (quoting *Berge v. Gorton*, 88 Wn.2d 756, 762, 567 P.2d 187 (1977)). We will not dismiss an action "simply because a complaint fails to artfully state each element of a particular cause of action." *Grothe v. Kushnivich*, 24 Wn. App. 2d 755, 763, 521 P.3d 228 (2022).

CR 12(b)(6) and CR 12(c) motions should be granted "'sparingly and with care and only in the unusual case in which [the] plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.'" *Scott v. Amazon*, No. 103730-9, slip op. at 8-9 (Wash. Feb. 19, 2026)[13] (internal quotation marks omitted) (quoting *Paradise, Inc. v. Pierce County*, 124 Wn. App. 759, 767, 102 P.3d 173 (2004)). "'The court presumes all facts alleged in the plaintiff's complaint are true and may consider hypothetical facts supporting the plaintiff's claims.'" *Id.* at 8 (quoting *Kinney*, 159 Wn.2d at 842). Dismissal based on failure to state a claim should be granted only if "the plaintiff cannot prove any set of facts consistent with the complaint which would justify recovery." *Wash. State Hum. Rts. Comm'n v. Hous. Auth.*, 21 Wn. App. 2d 978, 983, 509 P.3d 319 (2022). "'[A]ny hypothetical situation conceivably raised by the complaint

[13] https://www.courts.wa.gov/opinions/pdf/1037309.pdf

defeats a . . . motion [to dismiss] if it is legally sufficient to support [the] plaintiff's claim.'" *Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 750, 888 P.2d 147 (1995) (first alteration in original) (quoting *Halvorson v. Dahl*, 89 Wn.2d 673, 674, 574 P.2d 1190 (1978)). But dismissal is appropriate if claims are not cognizable as a matter of law. *Gorman v. Garlock, Inc.*, 155 Wn.2d 198, 215, 118 P.3d 311 (2005).

"If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." CR 12(c). However, "'where the basic operative facts are undisputed and the core issue is one of law, the motion to dismiss need not be treated as a motion for summary judgment.'" *Wash. State Hum. Rts. Comm'n*, 21 Wn. App. 2d at 983 (internal quotation marks omitted) (quoting *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 827 n.2, 355 P.3d 1100 (2015)). Additionally, "the court 'may take judicial notice of public documents if their authenticity cannot be reasonably disputed' without converting the motion to a motion for summary judgment." *Id.* (quoting *Rodriguez v. Loudeye Corp.*, 144 Wn. App. 709, 725-26, 189 P.3d 168 (2008)). And we may consider "'[d]ocuments whose contents are alleged in a complaint but which are not physically attached to the pleading.'" *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Trujillo*, 183 Wn.2d at 827 n.2).

The parties below introduced some additional evidence outside the pleadings, mostly in support of their arguments regarding class certification. But the trial court was correct not to convert the motion for judgment on the pleadings to a motion for summary judgment. The trial court explicitly stated that it was not converting the motion, that it was considering only legal issues, and that to the extent the additional evidence had any "utility," it was only to help the court

consider the universe of conceivable facts that could support the plaintiffs' claims. 1 VRP at 18. Additionally, the trial court did not expressly rely on any evidence outside the pleadings to make its ruling. Therefore, under *Washington State Human Rights Commission,* it was appropriate for the trial court to address the Department's motions as motions to dismiss under CR 12(b)(6) and CR 12(c).

Thus, we review de novo whether the standard for CR 12(b)(6) and CR 12(c) dismissal on the pleadings is met. We must determine whether there is any set of hypothetical facts supported by the pleadings that would justify recovery. A claim must be dismissed if it is not legally cognizable.

Although the parties cite evidence in the record that goes beyond the limitations described above, given the procedural posture of the case, we limit our consideration to the pleadings, documents referenced by or attached to the pleadings, and public documents whose authenticity the parties do not dispute. *See Wash. State Hum. Rts. Comm'n*, 21 Wn. App. 2d at 983. We do not rely on evidence outside the pleadings except to the extent permitted by law; for instance, we refer in some cases to the Department's "Solitary Confinement Transformation Project" report because it is a document publicly released by a state agency. For similar reasons, we also refer to the Department's 2024 Presumptive Drug Testing Policy.

## II. PRP AS SOLE AVENUE FOR RELIEF FROM PRISON DISCIPLINE DECISIONS

The Department contends that because all of the plaintiffs' claims challenge the Department's "use of [colorimetric tests] in prison discipline," they are all "impermissible collateral attack[s] on" the Department's findings that the plaintiffs were guilty of infractions. Resp't's Br. at 40. It argues that incarcerated people can only challenge prison discipline decisions

through habeas corpus petitions or PRPs. To support this claim, the Department analogizes to federal cases—*Preiser v. Rodriguez*,[14] *Heck v. Humphrey*,[15] and *Edwards v. Balisok*[16]—holding incarcerated people must pursue habeas corpus remedies before "attacking the fact or duration of confinement through a 42 U.S.C. § 1983 action." Resp't's Br. at 42-43. We disagree.

Under RAP 16.4(d), "[t]he appellate court will only grant relief by a personal restraint petition if other remedies which may be available to petitioner are inadequate under the circumstances." Moreover, "a demand for monetary damages is not actionable by personal restraint petition." *In re Pers. Restraint of Williams*, 171 Wn.2d 253, 256, 250 P.3d 112 (2011).

A.      Cases the Trial Court Relied on

The trial court determined based on a combined reading of three Washington Supreme Court cases—*Kozol*, *Colvin*, and *Williams*, 198 Wn.2d—that an individual PRP is the only avenue for each of the plaintiffs to seek relief. But these cases do not support the trial court's conclusion.

In *Kozol*, an incarcerated person sought to file a statutory writ of review under RCW 7.16.040 to challenge a prison discipline sanction of 10 days of cell confinement. 185 Wn.2d at 406, 408. The statute permits a writ of review only if there is no "adequate remedy at law" for "an inferior tribunal['s]" illegal exercise of "judicial functions." RCW 7.16.040. The Washington Supreme Court held that Kozol could not obtain a writ because he had an adequate remedy at law in the form of a PRP, which is "[o]rdinarily" the method by which a person challenges prison discipline sanctions. *Kozol*, 185 Wn.2d at 407.

---

[14] 411 U.S. 475, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973).
[15] 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).
[16] 520 U.S. 641, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997).

A few years later in *Colvin*, five incarcerated people sought a writ of mandamus in early 2020 asking the court to direct the Governor and the Department to release incarcerated people falling into certain categories immediately due to the onset of the COVID-19 pandemic. 195 Wn.2d at 884. In the alternative, the petitioners sought "to amend their petition by filing a personal restraint petition." *Id.* The Washington Supreme Court denied the writ, noting that "mandamus is a rare and extraordinary remedy" which requires a showing that the law prescribes "a clear duty to act." *Id.* at 890, 894. The petitioners failed to meet their "'demanding burden'" to identify a specific duty requiring the Governor and the Department to release incarcerated people under these circumstances. *Id.* at 894 (internal quotation marks omitted) (quoting *Eugster v. City of Spokane*, 118 Wn. App. 383, 403, 76 P.3d 741 (2003)).

The *Colvin* court also denied the petitioners' request to add a PRP by amendment because they could not show that their restraint was unlawful. *Id.* at 899-901. It added that the petitioners had a "pending action for declaratory and injunctive relief making similar prison conditions arguments," and that even if a PRP was otherwise appropriate, that civil suit might be an adequate remedy such that a PRP would be unavailable under RAP 16.4(d). *Id.* at 900 n.9 (citation omitted). Significantly, the Court stated that "[l]awsuits challenging prison conditions are generally litigated in civil rights or declaratory judgment actions." *Id.*

Soon after, in *Williams*, an incarcerated person brought a PRP arguing that because of his poor health and the danger of the COVID-19 pandemic, his continued incarceration constituted cruel punishment under the state and federal constitutions. 198 Wn.2d at 346-47. The Washington Supreme Court granting Williams' petition in part, held that some aspects of his confinement "constituted cruel punishment," and directed the Department to either release him or to remedy the

cruel conditions. *Id.* at 352. Because the Department ultimately remedied the conditions, the court did not require Williams' release. *Id.* at 347.

The primary holding in *Williams* was that the "deliberate indifference" standard for federal Eighth Amendment claims should not apply to Washington's own cruel punishment clause, which is more protective than its federal counterpart. *Id.* at 364. As part of its analysis, the *Williams* court discussed PRPs:

> [C]hallenges to conditions of confinement under article I, section 14 of Washington's constitution *generally* arise as PRPs, seeking injunctive relief ordering prisons to remedy any unconstitutional conditions. PRPs do not attach personal liability for monetary damages for deprivations of constitutional rights; rather, they seek an institutional change to remedy an unconstitutional action or condition.

198 Wn.2d at 366 (emphasis added) (citations omitted).

In sum, litigants seeking avenues for relief such as statutory writs or writs of mandamus must meet certain specific requirements to advance their claims. *See Kozol*, 185 Wn.2d at 411; *see also Colvin*, 195 Wn.2d at 894. Where those requirements include no other adequate remedy at law being available, the fact that the litigant could bring a PRP will foreclose that avenue for relief. *See Kozol*, 185 Wn.2d at 411. And Washington courts recognize that PRPs are the typical vehicle incarcerated litigants use when they seek to change conditions of their confinement that they maintain are unconstitutional. *See id.* at 407; *Williams*, 198 Wn.2d at 366.

However, these cases do not conclude that all claims challenging prison discipline must be brought as a habeas corpus petition or a PRP, nor do they establish that such claims cannot be raised in a class action suit. To start, the PRP rule states plainly that PRPs will proceed only when other remedies are inadequate, expressly contemplating that other available remedies exist. RAP 16.4(d). Moreover, neither *Colvin* nor *Williams* specifically addressed prison discipline. And while

23

these cases contain language suggesting that incarcerated people "ordinarily," *Kozol*, 185 Wn.2d at 407, or "generally," *Williams*, 198 Wn.2d at 366, file PRPs when challenging conditions of confinement, they do not demand a conclusion that no other avenues for relief are available when a PRP is viable. Even if PRPs have historically been the typical way that people challenge prison discipline decisions, that does not mean that they are the exclusive method of doing so under Washington law.

The *Kozol* and *Colvin* courts held that the relief their respective petitioners sought was unavailable because of specific requirements for the narrowly available writs they sought. In *Kozol*, the statute authorizing writs of review required that there be no other adequate remedy available, which is why the availability of a PRP barred the petitioner from bringing a writ. 185 Wn.2d at 411. In *Colvin*, the petitioners' claim failed because they could not show that the Governor or the Department was violating any duty at law that would support a writ of mandamus, a "rare and extraordinary remedy." 195 Wn.2d at 890. Here, none of the claims the plaintiffs raised in their complaint contain similarly strict requirements.

Additionally, the *Colvin* court stated in dicta that it could have considered the petitioners' separate "pending action for declaratory and injunctive relief" to determine whether that action provided recourse for the petitioners that would make a PRP unavailable. *Id.* at 900 n.9. The *Colvin* court's express recognition of claims for declaratory and injunctive relief outside of the PRP avenue is inconsistent with the holding the Department urges us to adopt in this case. And the Washington Supreme Court has stated in other instances that civil claims for injunctive relief or damages are appropriate when an incarcerated person challenges the conditions of their confinement. *See In re Det. of Turay*, 139 Wn.2d 379, 420, 986 P.2d 790 (1999). This reasoning

further supports a conclusion that a PRP is not the exclusive avenue for bringing the plaintiffs' claims.

B. Federal Cases Barring 42 U.S.C. § 1983 Claims

The Department next argues that federal cases should persuade us to depart from the reasoning above and conclude that the plaintiffs' claims can only be brought in PRPs. We disagree.

 1. *Preiser v. Rodriguez*

In *Preiser*, state prisoners deprived of good time credits due to disciplinary sanctions brought a claim under 42 U.S.C. § 1983, alleging violations of the 14th Amendment to the United States Constitution and seeking injunctive relief to restore their credits. 411 U.S. at 476, 478. The United States Supreme Court evaluated whether the petitioners could validly bring such a claim, or if they were limited to pursuing "the specific remedy of habeas corpus." *Id.* at 482. The Court noted that the petitioners' claims "fell squarely within [the] traditional scope of habeas corpus" and that it was "beyond doubt . . . that the respondents could have sought and obtained fully effective relief through federal habeas corpus proceedings." *Id.* at 487-88.

The Court held that habeas corpus was not only an appropriate remedy but an exclusive one when "a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to . . . release." *Id.* at 500. Significantly, the Court emphasized federalism concerns in its reasoning, highlighting the federal habeas corpus statute's state exhaustion requirement:

> In amending the habeas corpus laws in 1948, Congress clearly required exhaustion of adequate state remedies as a condition precedent to the invocation of federal judicial relief under those laws. It would wholly frustrate explicit congressional intent to hold that the respondents in the present case could evade this requirement by the simple expedient of putting a different label on their pleadings. . . . [T]he reason why only habeas corpus can be used to challenge a state

> prisoner's underlying conviction *is the strong policy requiring exhaustion of state remedies in that situation—to avoid the unnecessary friction between the federal and state court systems that would result if a lower federal court upset a state court conviction without first giving the state court system an opportunity to correct its own constitutional errors.*

*Id.* at 489-90 (emphasis added).

The *Preiser* Court also noted, in dicta, that had the petitioners sought damages instead of good time credits, they would be "attacking something other than the fact or length of [their] confinement, and . . . seeking something other than immediate or more speedy release." *Id.* at 494. In that case, habeas corpus would not be "an appropriate or available federal remedy." *Id.*

2.    *Heck v. Humphrey*

Twenty years later, the Court held in *Heck* that people incarcerated by a state cannot bring a federal constitutional damages suit under 42 U.S.C. § 1983 and must instead bring a habeas corpus petition if proving the section 1983 claim would necessarily prove that their confinement was unlawful. 512 U.S. at 486. This holding both built on *Preiser* and disavowed the *Preiser* Court's dicta about damages claims. The *Heck* Court reasoned that "when establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction[,] . . . the claimant *can* be said to be 'attacking . . . the fact or length of . . . confinement,' bringing the suit within the" realm of habeas corpus. *Id.* at 481-82 (second and third alteration in original) (quoting *Preiser*, 411 U.S. at 490).

Justice Scalia, writing for the majority, acknowledged the federal habeas corpus statute's state exhaustion requirement (and section 1983's lack of such a requirement) but did not emphasize it in his reasoning. *Id.* at 483. Instead, he analogized a section 1983 damages claim to a tort claim for malicious prosecution, noting that the latter claim required a plaintiff to prove that the

underlying conviction had already been invalidated to "'avoid[] parallel litigation over the issues of probable cause and guilt.'" *Id.* at 484 (quoting 8 STUART M. SPEISER, CHARLES F. KRAUSE & ALFRED W. GANS, AMERICAN LAW OF TORTS § 28:5 at 24 (1991)). Making habeas corpus petitions exclusive would similarly avoid parallel litigation.

Justice Souter, concurring in the judgment and joined by three other justices, wrote that he "d[id] not think that the existence of the tort of malicious prosecution alone provides the answer." 512 U.S. at 492 (Souter, J., concurring in judgment). Souter would have hewed more closely to "the interpretive methodology employed in *Preiser*," which focused on the federal habeas corpus statute and its state exhaustion requirement. *Id.* at 497 (Souter, J., concurring in judgment). He encouraged a reading of the majority opinion in which the requirement pulled from the malicious prosecution tort—that a plaintiff must show their underlying conviction was invalidated—applies to a section 1983 damages action that implicates a plaintiff's confinement in state prison because it "has the effect of requiring a state prisoner challenging the lawfulness of his confinement to follow habeas's rules," including, most notably, the exhaustion requirement. *Id.* at 498 (Souter, J., concurring in judgment).

### 3. *Edwards v. Balisok*

A few years later, the Supreme Court reaffirmed its holding from *Heck* in *Edwards*. *Edwards*, 520 U.S. at 643. In *Edwards*, an incarcerated person brought a 42 U.S.C. § 1983 damages action that was not tied to an underlying challenge to a conviction or sentence. *Id.* Instead, Balisok, an incarcerated person, was "challenging the validity of the procedures used to deprive him of good-time credits." *Id.* Among other things, the plaintiff claimed that the officer presiding over his disciplinary hearing was biased. *Id.* at 647. The Court held that where proving a procedural defect

27

necessarily proves that the extension of the plaintiff's sentence was invalid, the claim must be brought under habeas corpus. *Id.* at 646. This is true even if the plaintiff is claiming only that the procedures used to discipline them were invalid, and not that the result of the disciplinary proceedings was wrong. *Id.* at 645.

4.  Applicability to state law claims

The progression of *Preiser*, *Heck*, and *Edwards* ended with the holding that where a claim challenges a prison discipline decision involving a reduction in good time credits, recovery under section 1983 is not available. But these cases do not compel us to adopt a similar holding limiting incarcerated people to PRPs. The federal cases address federal statutes and are not binding on this court's analysis of state law. They are applicable only to the extent that we find their reasoning persuasive.

There is some appeal in the Supreme Court's approach, which channels all challenges to prison infractions neatly into a single system. But we decline to adopt a comparable limitation for several reasons.

First, the federalism concerns underlying the Supreme Court's reasoning are inapplicable here. The court's original holding in *Preiser* was firmly rooted in federalism principles. The federal habeas corpus statute has a state exhaustion requirement, so requiring litigants to file habeas corpus petitions in these circumstances ensures that the federal courts do not bypass the state, which has an "important interest" and is "in a better physical and practical position to deal with those grievances." *Preiser*, 411 U.S. at 492. No such concerns arise here, where people incarcerated by the state bring state tort and constitutional claims.

Second, the concerns expressed in *Heck* about avoiding parallel litigation are legitimate but do not convince us that the plaintiffs in this case must bring individual PRPs. As the plaintiffs point out, several of them are not able to bring PRPs in the first place; Ross has already been released from custody, and the Department has expunged Ross' and Schrum's infractions. Ross and Schrum would be denied relief altogether if a PRP were their only avenue for litigation. And damages are not available in a PRP.

Additionally, to the extent that courts may wish to avoid parallel litigation as to those class members who can bring PRPs, a class action case may actually be more desirable. *If* a class is certified, a class action could broadly resolve the underlying issue—the permissibility of using colorimetric tests without confirmatory testing to support prison discipline—rather than risking different outcomes in each PRP.

Most importantly, as discussed above, RAP 16.4 and Washington courts' language surrounding PRPs do not signal an intent to make them the exclusive remedy in all prison discipline cases. The plain language of RAP 16.4 contemplates other available remedies. And Washington cases that suggest PRPs are the typical avenue for challenging prison discipline do not reflect a willingness to draw a hard line like the Supreme Court has done at the federal level. In fact, the Washington Supreme Court has stated that ordinary civil lawsuits may be an appropriate vehicle for challenges to prison discipline. For example, the *Colvin* court acknowledged there was "a pending action for declaratory and injunctive relief, making similar prison conditions arguments" to the ones the plaintiffs sought to bring in PRPs. 195 Wn.2d at 900 n.9 (citation omitted) The *Colvin* court noted that "[l]awsuits challenging prison conditions are generally litigated in civil rights or declaratory judgment actions." *Id.* It suggested that the availability of that civil rights

29

lawsuit might weigh *against* permitting a PRP since the rule language contemplates petitions being brought "if other remedies which may be available to petitioner are inadequate under the circumstances." RAP 16.4(d); *see also Colvin*, 195 Wn.2d at 900 n.9.

For all these reasons, we hold that PRPs and habeas petitions are not the exclusive avenue for challenging the prison discipline practices in this case, and that under these circumstances, where the petitioners are challenging a widespread discipline practice, a class action may be appropriate if the plaintiffs can meet the requirements for class certification.

### III. INJUNCTIVE AND DECLARATORY RELIEF FOR CONSTITUTIONAL VIOLATIONS

The plaintiffs seek to broadly enjoin the Department's practice of using colorimetric tests without laboratory confirmation to punish incarcerated people, which included placing them in solitary confinement and revoking good time credits. They argue that an injunction is proper because the Department's conduct violates the Washington State Constitution's cruel punishment and due process clauses. They also seek declaratory relief to this effect.

The Department argues that its conduct does not violate either clause of the Washington State Constitution, and that the plaintiffs' claims for injunctive and declaratory relief are moot because the Department has implemented the new policy that allows incarcerated people to request confirmatory lab testing of a presumptive positive colorimetric test result.[17] The Department contends this policy satisfies any constitutional concerns.

---

[17] The Department also claims that the plaintiffs have never provided any authority to support their injunctive and declaratory relief claims, and that those claims are therefore waived. The Department argues that the plaintiffs did not explain how their claims meet the standards for a due process or cruel punishment violation or brief the requirements of the Uniform Declaratory Judgments Act, ch. 7.24 RCW.

We reject the Department's argument. The plaintiffs made it clear in their complaint that they bring injunctive and declaratory relief claims based on the Department's use of colorimetric

We conclude that the plaintiffs' claims for injunctive and declaratory relief are not moot and the plaintiffs' allegations, when accepted as true as required by CR 12(c), sufficiently stated claims for injunctive and declaratory relief based on the prohibition against cruel punishment and their right to due process.

A.       Cruel Punishment

Article I, section 14 of the Washington State Constitution prohibits the infliction of cruel punishment. Washington's ban on cruel punishment is more protective than its federal counterpart in the Eighth Amendment. *Williams*, 198 Wn.2d at 354. This greater protection extends to conditions of confinement. *Id.* at 354-55. An incarcerated person can show that the conditions of their confinement are unconstitutionally cruel if "(1) those conditions create an objectively significant risk of serious harm or otherwise deprive the petitioner of the basic necessities of human dignity and (2) those conditions are not reasonably necessary to accomplish any legitimate penological goal." *Id.* at 363. "The four recognized 'legitimate penological goals' are retribution, deterrence, incapacitation, and rehabilitation." *State v. Reynolds*, 2 Wn.3d 195, 208, 535 P.3d 427 (2023) (quoting *State v. Bassett*, 192 Wn.2d 67, 87, 428 P.3d 343 (2018)).

With regard to the first prong, the plaintiffs allege in their complaint that the Department has admitted "'solitary confinement . . . causes long-lasting harm'" and that "'spending prolonged periods of time in isolation has devastating effects on an individual's mental and physical health

---

tests as a basis to punish incarcerated people for drug possession, allegedly violating the due process and cruel punishment clauses of the Washington State Constitution. It is not necessary for the plaintiffs to recite every element of an injunctive or declaratory claim in their complaint so long as they have pled sufficient facts to satisfy the claims if those facts are proven at trial. *See Grothe*, 24 Wn. App. 2d at 763. The plaintiffs pleaded those claims sufficiently to give fair notice to the Department. *See Champagne*, 163 Wn.2d at 84.

long after they leave [Department] facilities.'" CP at 9. (quoting Press Release Wash. Dep't of Corr., Department of Corrections Pledges to Drastically Reduce Use of Solitary Confinement and Announces Closure of Minimum Security Prison (June 26, 2023)). The Department's 2023 Solitary Confinement Transformation Project report acknowledges that solitary confinement can cause "physical damage[,] . . . the development of health problems, and potential consequences for mental health and general well-being," including "increased risk for self-directed violence and suicide" as well as "slowed brain activity and neurological damage." CP at 1778. The plaintiffs further allege that "[t]he international community has recognized more than 15 consecutive days in solitary confinement . . . as torture." CP at 8. In light of the plaintiffs' allegations, as well as the Department's acknowledgement of the psychological and physiological harms solitary confinement can cause, it is conceivable that placing people in solitary confinement, as plaintiffs allege the Department did to them, "create[s] an objectively significant risk of serious harm." *Williams*, 198 Wn.2d at 363.

Because we are reviewing a dismissal of constitutional claims under CR 12(c), we must accept the plaintiffs' allegations as true. They claim that the Department placed them, as well as others who are incarcerated, in solitary confinement based only or primarily on unconfirmed colorimetric drug tests, sometimes "for retaliatory purposes." CP at 10. They also allege that the Department knew or should have known the tests were highly unreliable and were often performed without following the manufacturer's instructions for proper use. The plaintiffs allege, and the Department acknowledges in its report, serious physical and psychological harms associated with solitary confinement.

The plaintiffs also allege that in light of these serious harms, there would be no legitimate penological goal behind placing a person in solitary confinement based solely or primarily on tests that the Department is not using properly and has reason to know are not accurate, unless the incarcerated person declines laboratory confirmation. To the extent that decisions to use these unreliable tests on incarcerated people's belongings were for retaliatory purposes as alleged in the complaint, it is even clearer that doing so would be unsupported by any legitimate penological goal. Assuming the facts alleged in the complaint are true, as we must at this stage, we hold that the plaintiffs have made sufficient allegations to support a claim for injunctive and declaratory relief based on a violation of their right to be free from cruel punishment. Specifically, the plaintiffs have made sufficient factual allegations that, if true, would entitle them to a declaration that their constitutional rights are violated when the Department uses unconfirmed colorimetric tests as a basis for discipline unless the incarcerated person refuses lab testing, as well as an injunction ordering the Department to stop doing so. Depending on how the facts develop, they may also be able to show they are entitled to an order requiring some good time credits to be restored.

B.      Due Process

The Department argues that the use of colorimetric tests as the only evidence to support sanctions does not violate an individual's due process rights as a matter of law because a positive result from even an unreliable test constitutes "some evidence," which is the standard required to impose discipline in prison. The plaintiffs respond that the colorimetric tests alone do not constitute "some evidence" because of their unreliability. Assuming the truth of the plaintiffs' allegations as we must at this stage of the proceedings, we hold that the plaintiffs have alleged sufficient facts to support their due process claim.

Article I, section 3 of the Washington State Constitution maintains, "No person shall be deprived of life, liberty, or property, without due process of law." It is well established that there is "a constitutionally protected liberty interest in [good time] credits." *In re Pers. Restraint of Johnston*, 109 Wn.2d 493, 497, 745 P.2d 864 (1987).

Due process requires there must be "some evidence" to support a prison disciplinary decision that results in a "loss of liberty." *In re Pers. Restraint of Grantham*, 168 Wn.2d 204, 215-16, 227 P.3d 285 (2010). There is "some evidence" to support a prison discipline decision if "'there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Johnston*, 109 Wn.2d at 497 (emphasis omitted) (quoting *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455-56, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985)). Courts are not required to "examin[e] . . . the entire record, independent[ly] assess[] . . . the credibility of witnesses, or weigh[] . . . the evidence." *Id.* (quoting *Hill*, 472 U.S. at 455).

In *Johnston*, several incarcerated people alleged that the Department violated their due process rights when it revoked good time credits and imposed solitary confinement after finding them guilty of drug use based on positive urinalysis test results. 109 Wn.2d at 494. They argued that "a single positive result" from such a test was insufficient evidence to support their infractions. *Id.* at 496.

The *Johnston* court explained:

"The question, 'How reliable is the test?' is one for scientists to resolve; the question, 'Is the test sufficiently reliable such that its use as the basis for imposing disciplinary sanctions against prisoners does not offend constitutional standards?' is a legal matter to which different standards apply."

*Id.* at 499 (quoting *Peranzo v. Coughlin*, 608 F. Supp. 1504, 1507 (S.D.N.Y. 1985)). The court then determined that the urinalysis tests constituted some evidence, reasoning that many courts

and scientific sources had found the tests in question to be upwards of 95 percent accurate. *Id.* It acknowledged one study that found the test to be only 75 percent accurate, as well as two expert affidavits that "challenge[d] the reliability of a single" test. *Id.* at 500. But the court found that discrepancy "immaterial" based on "the lesser evidentiary standards applicable in prison disciplinary hearings." *Id.*

The plaintiffs here make several broad allegations in their complaint that colorimetric tests are not, as *Johnston* requires, "'sufficiently reliable'" to "'use as the basis for imposing disciplinary sanctions against prisoners.'" *Id.* at 499 (quoting *Peranzo*, 608 F. Supp. at 1507). The plaintiffs allege generally that colorimetric tests are "highly unreliable," CP at 4, "'only marginally better than a coin[-]flip,'" CP at 7 (quoting *Green*, No. 2184CV02283, slip op. at 8 ), and not appropriate for use "as evidence of the presence or absence of drugs" without confirmatory lab testing, CP at 4. They also make more specific allegations: that the Department is not following manufacturer's instructions on how to conduct the tests; that the tests cannot accurately detect spice due to its varying chemical composition; that the tests are "not designed to be swabbed on paper or mail in the way that [the Department] is using them" because "the tests can react to trace chemicals commonly found on paper products[] the same way they would react to the chemicals used to create synthetic drugs," CP at 7; and that Department staff members are aware that the tests are inaccurate and will return false positives on common items, including items sold in the Department's own commissary.

Based on the pleadings, it is conceivable that the colorimetric tests at issue in this case are significantly less reliable than the urinalysis tests in *Johnston* that most authorities agreed were at least 95 percent accurate. We do not, at this stage, weigh the evidence to determine whether

colorimetric tests constitute "some evidence."[18] The plaintiffs alleged sufficient facts in their

complaint that, if true, would support a conclusion that they do not. On a motion for judgment on

the pleadings, we accept the plaintiffs' allegations as true. *P.E. Sys.,* 176 Wn.2d at 210-11. We

hold that to the extent the plaintiffs had good time credits revoked due to unconfirmed colorimetric

tests, they have stated an adequate claim for injunctive and declaratory relief based on alleged due

process violations.[19]

C.     Mootness

The Department argues that the plaintiffs' request for injunctive and declaratory relief is

now moot because the Department has changed its policy to allow incarcerated people the right to

request laboratory confirmation.[20] The new policy only allows incarcerated people to *request*

---

[18] We acknowledge the plaintiffs' invitation to revisit the "some evidence" standard, which Justice González has argued "does not offer meaningful due process protection to incarcerated people." Appellants' Reply Br. at 18 n.12 (González, J., concurring) (quoting *In re Pers. Restraint of Schley*, 191 Wn.2d 278, 294, 421 P.3d 951 (2018). Because the "some evidence" standard has been established by the Washington Supreme Court, we may not impose a different standard.

[19] The Department also argues there can be no due process violation as to the Department's decision to place the plaintiffs in solitary confinement (or it contends, any disciplinary sanction other than the revocation of good time credits) because placement in solitary confinement does not implicate a protected liberty interest. Washington courts have never squarely considered whether incarcerated people have a liberty interest in avoiding solitary confinement under the state constitution. We are already reversing and allowing the plaintiffs' claims for injunctive relief based on cruel punishment (and due process as to the revocation of good time credits) to proceed. Because the law is still unsettled as to whether solitary confinement or other punishments can result in the loss of liberty under the state constitution, we leave this argument for further development on remand.

[20] The Department also complains that the plaintiffs' request for an injunction to stop "'the actions, customs, conditions, policies, and practices described in' their Complaint" is insufficiently specific. Resp't's Br. at 50 (quoting record). The Department questions whether the plaintiffs are requesting "an injunction against the use of [colorimetric tests] entirely." *Id.* But a holistic reading of the plaintiffs' complaint, which repeatedly emphasizes the necessity of confirmatory testing to verify colorimetric test results, demonstrates that the plaintiffs instead seek an injunction requiring

confirmatory lab testing. In addition, the Department continues to assert it could rely on colorimetric test results alone to support prison discipline. Thus, the new policy does not render the plaintiffs' claims for declaratory and injunctive relief moot.

"An issue is moot if 'a court can no longer provide effective relief.'" *Doe v. Thurston County*, 4 Wn.3d 906, 916, 569 P.3d 1101 (2025) (quoting *AURC III, LLC v. Point Ruston Phase II, LLC*, 3 Wn.3d 80, 86, 546 P.3d 385 (2024)). A claim for an injunction is moot only if it is "absolutely clear [that] the allegedly wrongful behavior could not reasonably be expected to recur." *State v. Ralph Williams' N. W. Chrysler Plymouth, Inc.*, 82 Wn.2d 265, 272, 510 P.2d 233 (1973). Generally, "[v]oluntary cessation of allegedly illegal conduct does not moot a case because there is still a likelihood of the illegal conduct recurring." *Id.* A party arguing that a new policy moots a case has a "'heavy burden'" to show that there is no evidence of "gamesmanship" or risk that it will revert to engaging in the challenged behavior once the threat of litigation has subsided. *Family of Butts v. Constantine*, 198 Wn.2d 27, 41, 491 P.3d 132 (2021) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719, 127 S. Ct. 2738, 168 L. Ed. 2d 508 (2007)).

The Washington Supreme Court has evaluated mootness based on a claim that a voluntary change to a government policy or practice has eliminated the basis for the plaintiff's claim. *See id.* at 41-42. Mootness depends on whether the government has disavowed the abandoned policy or continues to assert that the policy was valid. *See id.* at 41(county executive's order changing the challenged policy mooted the plaintiffs' claim because the executive "made no effort to defend

---

lab testing in every case where the Department intends to rely on colorimetric tests for disciplinary action and the incarcerated person does not refuse lab testing. *See Champagne*, 163 Wn.2d at 84-85 (outlining Washington's liberal pleading standards).

[the old policy's] legitimacy before [the] court . . . and expressly stated he 'ha[d] no plans to re-adopt th[e] provision'") (quoting record); *see also Parents Involved*, 551 U.S. at 719 (holding that the school district's change of policy did not moot the plaintiffs' case against it because "the district vigorously defend[ed] the constitutionality of its race-based program, and nowhere suggest[ed] that if this litigation [was] resolved in its favor it w[ould] not resume using race to assign students") (cited in *Butts*, 198 Wn.2d at 41).

Here, the plaintiffs' claims are not moot because the plain language of the Department's new policy does not guarantee that people will be entitled to a confirmatory lab test before being punished based on a positive colorimetric test result. Instead, it states that incarcerated people "may *request* laboratory confirmation" for a positive colorimetric test. CP at 1633 (emphasis added). The policy ensures that people will receive a form to request confirmation with their infraction report, but it does not promise that the request will be fulfilled or that the positive colorimetric test will be disregarded if it is not. Additionally, there is no indication in the new policy that the Department will refrain from placing people in solitary confinement while confirmation of a positive colorimetric test is pending. And we must accept as true the plaintiffs' allegation that the Department puts people in solitary confinement while disciplinary proceedings and appeals are pending.

Even if the Department's new policy did guarantee access to confirmatory testing, the Department continues to argue that presumptive drug tests alone are sufficient evidence to support infractions and has not confirmed that it will not return to its old policy in the future. *See, e.g.*, Resp't's Br. at 49 ("Plaintiffs cannot show that [colorimetric tests] are so unreliable that their use as the sole evidence to support disciplinary sanctions violates their due process rights[.]"). Indeed,

the plaintiffs allege that the Department has continued to punish incarcerated people based on colorimetric test results without providing laboratory confirmation. Thus, the circumstances in *Butts* that persuaded the court that there was no risk of the old policy resurfacing are not present here. Although the Department could take steps to make more concrete assurances that might change this analysis, assuming the facts alleged in the complaint are true, we hold that the plaintiffs' claims are not moot at this time.[21]

## IV. TORT CLAIMS

The plaintiffs argue that the trial court erred when it dismissed their tort claims for intentional and negligent infliction of emotional distress.[22] The Department responds that the plaintiffs' tort claims are barred by sovereign and discretionary immunity and that even if they are not, the plaintiffs failed to state a claim for either tort.

We conclude that the Department has not shown that either form of immunity bars the plaintiffs' claims at this stage of the proceedings. We also conclude that the plaintiffs have stated a claim for both intentional and negligent infliction of emotional distress.

---

[21] Because the plaintiffs' requests for injunctive and declaratory relief are not moot, for the same reasons they have pleaded enough to maintain an injunctive relief claim based on underlying constitutional violations, the plaintiffs' declaratory relief claim also survives at this stage in the litigation.

[22] In their complaint, the plaintiffs also brought a general negligence claim. However, they do not mention this claim in their assignments of error or their opening brief, and we therefore treat it as abandoned. Although the plaintiffs resurrect the general negligence claim in their reply brief, "[a]n issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

A.      Immunity

       1.      Sovereign immunity

"Article II, section 26 of the Washington Constitution authorizes the legislature to 'direct by law, in what manner, and in what courts, suits may be brought against the state.'" *H.B.H. v. State*, 192 Wn.2d 154, 178, 429 P.3d 484 (2018) (quoting Wash. Const. art. II, § 26). The legislature has waived the state's sovereign immunity for most tort suits: "The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct *to the same extent as if it were a private person or corporation*." RCW 4.92.090 (emphasis added).

The Department first claims that it is entitled to sovereign immunity because "internal management decisions of [the Department] . . . are not comparable to any private activity." Resp't's Br. at 28. We disagree.

Washington's waiver of state sovereign immunity is among "'the broadest . . . in the country' and makes the State presumptively liable for all its alleged tortious conduct 'in all instances in which the Legislature has not indicated otherwise.'" *H.B.H.*, 192 Wn.2d at 179 (emphasis omitted) (quoting *Savage v. State*, 127 Wn.2d 434, 444-45, 899 P.2d 1270 (1995)). Limitations on this broad waiver "have typically been procedural in nature, such as requiring notice of claims [or] restricting executions on judgments." *Hanson v. Carmona*, 1 Wn.3d 362, 379, 525 P.3d 940 (2023). The legislature has also "partially restored immunity for certain limited types of conduct, such as . . . a statute granting qualified immunity to municipal employees with responsibilities for electrical utilities." *Id.*

In *H.B.H.*, former foster children brought a negligence suit against the Department of Social and Health Services (DSHS). 192 Wn.2d at 158. They alleged that DSHS breached its duty to protect foster children in its care from foreseeable harm when they placed children with foster parents and failed to discover abuse by those parents despite receiving several concerning reports. *Id.* at 160-61. The Washington Supreme Court rejected DSHS's argument that it was entitled to sovereign immunity because its role of placing children in foster care is "a government function that cannot be undertaken by private persons or corporations." *Id.* at 179. The court explained that although "it is appropriate to draw analogies between the State's conduct and comparable conduct performed in the private sector[,] . . . [f]or tort liability to attach, the State does not necessarily have to be doing something that a private party does." *Id.* at 179-80. Instead, "the focus of the waiver statute is on the presence of *tortious* conduct, rather than comparable private conduct." *Id.* at 180.

*H.B.H.* requires only that the government conduct be "analogous, in some degree at least, to the chargeable misconduct and liability of a private person or corporation." *Id.* (quoting *Evangelical United Brethren Church of Adna v. State*, 67 Wn.2d 246, 253, 407 P.2d 440 (1965)). "Under our waiver statute, there is no 'private analog' requirement." *Id.* The *H.B.H.* court also pointed out that in any case, there was analogous private conduct because "private persons entrust the care of children in their custody to schools, camps, and day care centers on a daily basis" and that these "are comparable private relationships that give rise to a duty in tort." *Id.*

Because the *H.B.H.* court was clear that there is no private analog requirement, sovereign immunity does not apply here. The statutory waiver presumptively permits lawsuits for tortious conduct, and as we explain below, given the procedural posture of this case, the plaintiffs have

41

stated claims for torts. Additionally, the legislature has not explicitly carved out immunity for the Department. Under *H.B.H.*, it is not fatal to the plaintiffs' claims if the Department's conduct is something that only the government, and not a private party, can do, so long as the Department's official conduct is "'analogous[] in some degree" to "liability of a private person or corporation.'" *Id.* at 180 (quoting *Evangelical*, 67 Wn.2d at 253).

Here, the Department's general supervision over incarcerated people and its alleged specific use of unreliable drug testing to impose punishment is analogous to some degree to conduct that occurs in the private sector. For instance, similar conduct could occur at privately run detention facilities for youth or immigrants, such as Martin Hall Juvenile Detention Facility or the Northwest ICE Processing Center. Similar conduct could also occur in private mental health commitment facilities or private drug treatment centers where residents may not be free to leave and would depend on the facility for their care and safety. In all of these places, there could be lawsuits aimed at conditions of confinement that implicate the basis for imposing negative consequences on residents. And in recent history there has been a direct analog—the Department has contracted with private prisons, where identical lawsuits could have arisen. *See* RCW 70.395.030 (making it illegal, with some exceptions, to operate a private detention facility in Washington but permitting existing contracts for such prisons to continue until their set expiration dates). Given the minimal analogy that *H.B.H.* demands and the procedural posture of this case where the parties have not fully developed the facts, leaving us to consider hypotheticals, we hold that the State has not established that sovereign immunity applies at this stage.

2.      Discretionary immunity

The Department next argues that the conduct plaintiffs challenge is the product of "high-level policy[making] decisions" and is therefore protected by discretionary immunity. Resp't's Br. at 30. The plaintiffs maintain that the Department is not entitled to discretionary immunity because "[n]othing in the record shows a high-level [Department] executive consciously balanced the risks and advantages of punishing inmates based on [colorimetric] tests." Appellants' Reply Br. at 10. We conclude that the Department has not shown that discretionary immunity bars the plaintiffs' claims at this stage of the proceedings.

Even where sovereign immunity is waived, traditional common-law immunities such as discretionary immunity may still protect certain state actors' conduct from liability. *Evangelical*, 67 Wn.2d at 253. This is because a state act that can "be classified as a discretionary governmental process" is inherently "nontortious." *Id.* at 255. State conduct is protected by discretionary immunity when it involves "'basic policy decision[making] [that] has been committed to coordinate branches of government,'" implicating separation of powers concerns. *King v. City of Seattle*, 84 Wn.2d 239, 246, 525 P.2d 228 (1974) (quoting *Johnson v. State*, 69 Cal.2d 782, 793, 73 Cal. Rptr. 240, 447 P.2d 352 (1968)). Whether discretionary immunity applies is generally a question of law, "although in some instances it may well give rise to a mixed question of law and fact." *Evangelical*, 67 Wn.2d at 253.

Discretionary immunity has five elements: (1) challenged conduct must "necessarily involve a basic governmental policy, program, or objective"; (2) the conduct must be "essential to the realization or accomplishment of that policy, program, or objective" or "would not change the course or direction of the policy, program, or objective"; (3) the conduct must "require the exercise

of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved"; (4) "the governmental agency involved [must] possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act," *id.* at 255; and (5) State must be able to show that the conduct resulted from a "basic policy decision" made "by a high-level executive" after "a conscious balancing of risks and advantages." *Avellaneda v. State*, 167 Wn. App. 474, 481, 273 P.3d 477 (2012); *see also Est. of McCartney v. Pierce County*, 22 Wn. App. 2d 665, 680, 513 P.3d 119 (2022) (characterizing the conscious balancing requirement as "a fifth factor to the *Evangelical* test"). Discretionary immunity does not apply unless each element is "'clearly and unequivocally'" met. *Avellaneda*, 167 Wn. App. at 480 (quoting *Evangelical*, 67 Wn.2d at 255).

Although the Department may be correct that the conduct plaintiffs complain of is rooted in high-level policy decisions, that alone does not guarantee it will be protected by discretionary immunity. The Department has not yet shown that its policy of using colorimetric tests to put people in solitary confinement or revoke their good time credits was "made after consciously balancing risks and advantages." *McCartney*, 22 Wn. App. 2d at 680. While the Department may be able to make that showing after further factual development, at this stage where we consider only the pleadings, their attachments, and public documents, the lack of evidence that its conduct was the result of careful balancing is a bar to finding discretionary immunity at this time.

And even if the Department could show its conduct was the product of conscious risk balancing, the fourth prong of the *Evangelical* analysis requires the conduct in question to be legally authorized. Here, the plaintiffs claim that the Department's use of unconfirmed colorimetric tests to punish incarcerated people with solitary confinement or loss of good time

violates the Washington Constitution. They allege that the Department knows these tests are unreliable and that the Department nevertheless uses the tests to impose solitary confinement or revoke good time credits, sometimes for retaliatory purposes. If true, those facts could establish statutory or constitutional violations. At this stage of the litigation we must accept the plaintiffs' allegations as true, and we therefore cannot say at this time that the Department "possess[ed] the requisite constitutional . . . authority . . . to do . . . the challenged act." *Evangelical*, 67 Wn.2d at 255. Thus, we cannot conclude that all of the elements of discretionary immunity are certainly met at this stage.

B.      Outrage or Intentional Infliction of Emotional Distress

The plaintiffs argue that the trial court improperly failed to recognize "'reasonable minds' could differ on the question of whether [the Department's] imposition of punishment based on its use of [colorimetric] tests was outrageous." Appellants' Opening Br. at 41. They note that the trial court based its decision to dismiss the claim entirely on the persuasive value in *Khalif v. McKenzie*, an unpublished Division Three opinion.

The Department responds that its conduct cannot be outrageous as a matter of law because the Department is legally authorized—and therefore privileged—to use colorimetric tests to make disciplinary decisions and to make decisions about placing people into solitary confinement for administrative purposes. The Department further argues that it "has a duty to protect inmate health and safety" and it uses colorimetric tests "as one tool to combat the introduction of dangerous, illicit substances" into its prisons. Resp't's Br. at 35-36. Because "combat[ting] the introduction of dangerous, illicit substances . . . is what is expected in a civilized society," it argues its conduct is not outrageous. Resp't's Br. at 36. The Department also argues that "[f]or an outrage claim to

be viable, an individual actor must act outrageously with the intent to cause harm" and that because the plaintiffs are suing the Department itself rather than any individuals or particular employees, their claim necessarily fails. Resp't's Br. at 35.

We agree with the plaintiffs that their outrage claim should not have been dismissed because they alleged sufficient facts that, if true, could satisfy the elements of intentional infliction of emotional distress.

### 1.     Requirements for an Outrage Claim

"The tort of outrage requires the proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor*, 149 Wn.2d 192, 195, 66 P.3d 630 (2003). "[T]he tort of outrage 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Id.* at 196 (internal quotation marks omitted) (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975)). An outrage claim must instead "be predicated on behavior 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (emphasis omitted) (internal quotation marks omitted) (quoting *Grimsby*, 85 Wn.2d at 59).

"Although a jury ultimately determines if conduct is sufficiently outrageous, the court makes the initial determination of whether reasonable minds could differ about 'whether the conduct was sufficiently extreme to result in liability.'" *Trujillo*, 183 Wn.2d at 840 (internal quotation marks omitted) (quoting *Lyons v. U.S. Bank Nat'l Ass'n*, 181 Wn.2d 775, 792, 336 P.3d 1142 (2014)). In *Trujillo*, the plaintiff sued a mortgage corporation for outrage for initiating a foreclosure even though the corporation had sold its interest in the plaintiff's loan. *Id.* at 828-29.

Although the corporation's behavior violated the "Deeds of Trust Act," the Washington Supreme Court upheld the trial court's dismissal of the outrage claim on a CR 12(b)(6) motion. *Trujillo*, 183 Wn.2d at 841. The court concluded, as it had recently done in another case, that this was not the kind of "extreme" conduct that a reasonable person might find outrageous. *Id.* at 840 (citing *Lyons*, 181 Wn.2d at 792).

In addition, conduct that "'would otherwise be extreme and outrageous, may be privileged'" when the actor has "a legal privilege to do it." *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 91, 419 P.3d 819 (2018) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. g (AM. L. INST. 1965)). This is a slightly different issue than whether a government actor's conduct is entitled to sovereign or discretionary immunity. *Id.* ("The invocation of a legal privilege does not per se immunize one's conduct from a claim for intentional infliction of emotional distress."). An actor is not liable "where [they] ha[ve] done no more than to insist upon [their] legal rights in a permissible way, even though [they] [are] well aware that such insistence is certain to cause emotional distress." *Id.* (quoting RESTATEMENT § 46 cmt. g). But "[a] suit may arise when the manner of invoking a legal power intentionally inflicts emotional distress." *Id.* at 92.

In *Reyes*, a patient's family claimed a health clinic told the patient they would quarantine him if he did not submit to a tuberculosis treatment regimen. *Id.* at 91. The patient's family sued, alleging that this conduct was outrageous. *Id.* at 84-85. The Washington Supreme Court affirmed this court's grant of summary judgment in the clinic's favor. *Id.* at 92. The Supreme Court reasoned that the clinic's actions were privileged because it was acting under a "statutory scheme for diagnosing and treating tuberculosis." *Id.* The court noted that "[w]ere an official to use the threat of quarantine improperly, either to induce action other than compliance with a treatment regimen

or where there is no reasonable basis to believe that a quarantine is warranted, a claim [of outrage] may be warranted." *Id.* at 91. Thus, a claim of outrage can survive even if there is general legal authority supporting an action if the specific manner that the defendant chooses to carry out the action is outrageous.

2.      <u>*Khalif v. McKenzie*</u>

The trial court relied entirely on the reasoning in *Khalif* to dismiss the plaintiffs' outrage claim. In *Khalif*, an incarcerated person filed an outrage claim against three Department of Corrections employees. *Khalif*, No. 38045-9-III, slip op. at 1. One employee found Khalif in a different tier from his assigned cell, generally a violation of Department policy, and ordered him to return to his tier. *Id.* at 2. Khalif refused because he was in the different tier to complete a work assignment. *Id.* The Department employee gave Khalif an infraction for disobeying an order. *Id.* As punishment for the infraction, the Department placed Khalif in solitary confinement based on its administrative segregation policy. *Id.* Khalif brought outrage claims against this officer and two other Department employees who mistakenly disciplined him on separate occasions. *Id.* at 3. The trial court granted summary judgment for the Department employees. *Id.*

Division Three of this court affirmed, reasoning that "limited confinement to administrative segregation . . . is sometimes part of the prison experience, [so] the isolation of [Khalif] does not amount to extreme or outrageous behavior." *Id.* at 7. It noted that it "might rule that a question of fact existed as to outrageous conduct[] if Khalif presented evidence that one or more of the [Department] employees intentionally falsified records with the purpose of harming Khalif." *Id.* But Khalif had presented evidence only that he was mistakenly disciplined, and "no evidence that any officer did so knowingly." *Id.*

3.      Plaintiffs' Outrage Claim

First, the plaintiffs have alleged sufficient facts that, if true, would show that the Department's conduct is not legally privileged. Conduct that violates the constitution is not legally authorized. Although the Department is generally authorized to manage discipline within its facilities, the plaintiffs have alleged that the Department's use of unconfirmed colorimetric tests to punish incarcerated people with solitary confinement or loss of good time credits violates the Washington State Constitution. At this stage of the proceedings, because the plaintiffs have alleged a viable claim for constitutional violations based on the same conduct that supports their outrage claim, they have also sufficiently alleged that the Department's conduct was not legally privileged.

Additionally, the plaintiffs have alleged a viable claim for outrage based on the specific manner in which the plaintiffs allege the Department relied on colorimetric tests to punish them. *See Reyes*, 191 Wn.2d at 92. Plaintiffs have alleged that the Department knew the colorimetric tests were unreliable, that it was using the tests contrary to manufacturer instructions, that it knew items in its own commissary tested positive, and that Department employees regularly joked about the inaccuracy of the tests. Importantly, the plaintiffs also allege that with this knowledge, the Department sometimes used colorimetric tests on people's possessions "for retaliatory purposes." CP at 10. Again, we assume for the purposes of a CR 12(b)(6) and CR 12(c) motion that all of the allegations in the complaint are true.

The plaintiffs have also alleged that some of the punishments imposed based on these inaccurate tests—particularly solitary confinement and loss of good time credits resulting in longer sentences—were severe. We have already discussed the alleged harms associated with solitary confinement above. Additionally, it is conceivable that being forced to remain in prison past one's

release date based on intentional retaliatory use of inaccurate tests could cause serious harm. A reasonable person could conclude that imposing such punishments based on drug tests that the Department knows are inaccurate and using such tests for purposes of retaliation, as the plaintiffs allege the Department has done, is extreme and outrageous, which is all that is necessary at this stage of the litigation.

The Department's claim that the plaintiffs must identify specific actors does not change this result. It may be true that, as a practical matter, the plaintiffs will ultimately have to identify specific Department employees who, for example, used colorimetric tests in a retaliatory manner in order to prove that the conduct was reckless or intentional. But at this stage, alleging that some Department employees conducted colorimetric tests with the expectation that they would produce a false positive or to retaliate against the plaintiffs is enough to survive a motion to dismiss.

*Khalif* also does not change this result because that case is distinguishable. The court in *Khalif* was evaluating a grant of summary judgment, not a grant of judgment on the pleadings. The *Khalif* court held that there was no material dispute of fact because Khalif failed to establish evidence that the officers knew he was innocent when they punished him. *Khalif*, No. 38045-9-III, slip op. at 7-8. And the *Khalif* court acknowledged that an outrage claim might have been appropriate if Khalif had proved that staff members had disciplined him knowing that he had not broken any rules. *Id.* at 7. Here, the plaintiffs needed only to plead facts, which we assume are true, that would entitle them to relief.

The plaintiffs in this case allege that the Department knew the tests were unreliable, and corrections officers sometimes knowingly used the tests, which were prone to false positives, to retaliate against incarcerated people. It may be appropriate to dismiss an outrage claim on the

pleadings when existing case law has already established that identical alleged conduct could not possibly be sufficiently extreme. *See Trujillo*, 183 Wn.2d at 840. But *Khalif* is not so similar to the present case to compel dismissal. Here, taking the plaintiffs' allegations as true, we must assume at this stage that the colorimetric tests were knowingly used to retaliate. Therefore, we hold that judgment on the pleadings was inappropriate as to the outrage claim.

## C.    Negligent Infliction of Emotional Distress

The plaintiffs next claim that it was error for the trial court to dismiss their negligent infliction of emotional distress claim based on their failure to allege that the Department's conduct caused them physical injury. They argue that "physical injury is *not* required" to state a claim for negligent infliction of emotional distress, that the trial court mischaracterized the Department's duty by framing it as a narrow duty "'to protect from physical harm,'" and that in any case, several of the plaintiffs can show physical harm. Appellants' Opening Br. at 52-53 (quoting record). The Department responds that it owes incarcerated people a duty to protect them from physical injury only. Imposing a duty to protect against emotional distress would "override [its] ability to safely manage its prisons" to the extent that "emotional distress [is] occasioned by [prison] discipline." Resp't's Br. at 38. We conclude that in these unique circumstances, the plaintiffs have sufficiently alleged a claim of negligent infliction of emotional distress to survive a motion to dismiss under CR 12(c).

### 1.    Negligent infliction of emotional distress requirements

"A plaintiff may recover for negligent infliction of emotional distress if [they] prove[] negligence, that is, duty, breach of the standard of care, proximate cause, and damage, and prove[] the additional requirement of objective symptomatology." *Strong v. Terrell*, 147 Wn. App. 376,

387, 195 P.3d 977 (2008). "Each of these issues is a question of fact for the jury to resolve." *Id.* Physical symptoms are not required to fulfill the objective symptomatology requirement. *Hegel v. McMahon*, 136 Wn.2d 122, 134, 960 P.2d 424 (1998). Instead, it is enough for a plaintiff to show "emotional distress . . . susceptible to medical diagnosis and proved through medical evidence." *Id.* at 135.

The Department acknowledged at oral argument that the plaintiffs' complaint alleged some physical harm. It is conceivable that some or all of the plaintiffs will be able to prove both physical and mental health symptoms in light of the plaintiffs' allegation that solitary confinement causes devastating effects on mental and physical health. In addition, the Department admits that solitary confinement can cause "physical damage and the development of health problems" as well as "consequences for mental health[,] . . . slowed brain activity[,] and neurological damage." CP at 1778. Thus, even if the plaintiffs were required to allege physical harm to overcome a CR 12(c) motion to dismiss a claim of negligent infliction of emotional distress, they have done so here.

Furthermore, our case law is explicit that plaintiffs can satisfy the objective symptomatology requirement of a negligent infliction of emotional distress claim with non-physical, psychological symptoms so long as the symptoms can be medically diagnosed and proven.

2.    Relevance of the Department's special duty

The Department's argument that its special duty to incarcerated people extends only to instances of physical harm essentially invites us to convert the objective symptomatology standard to a physical harm standard in all negligent infliction of emotional distress cases where the Department is a defendant. We decline to do so because the special duty is not implicated here.

"As a matter of tort law, jailers and incarcerated people have a special relationship, which imposes on the jailer 'the duty to ensure health, welfare, and safety,'" *Anderson v. Grant County*, No. 103111-4, slip op. at 6 (Wash. Mar. 5, 2026)[23] (quoting *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 635, 244 P.3d 924 (2010)), and "to keep incarcerated people . . . 'free from harm,'" *id.* (quoting *Kusah v. McCorkle*, 100 Wash. 318, 325, 170 P. 1023 (1918)). "This duty is affirmative and nondelegable" and "arises from the custodial nature of incarceration." *Id.* At minimum, the Department's special duty is a positive one that requires it, in certain circumstances, to take responsibility for the protection of its charges even where the threat to their safety does not come from the Department itself. *See, e.g.*, *Kusah*, 100 Wash. at 325 (special duty rendered sheriff liable for one jailed person's attack on another); *Shea v. City of Spokane*, 17 Wn. App. 236, 242, 562 P.2d 264 (1977) (special duty rendered the City liable for the negligence of an independent contractor physician).

The only precedential case the Department cites to support its position that it has no duty to protect incarcerated people's emotional welfare is *Melville v. State*,[24] where the court held that the Department had no duty to provide rehabilitative mental health treatment to an incarcerated person who later shot his ex-wife and daughter after his release. Resp't's Br. at 37 (citing *Melville*, 115 Wn.2d at 38-39). There, the Department was not liable to third parties for a harm inflicted by a formerly incarcerated person. *Melville*, 115 Wn.2d at 39.

Here, by contrast, the plaintiffs accuse the Department of negligently inflicting emotional distress *on them directly* through the Department's own acts. The existence of a heightened duty

---

[23] https://www.courts.wa.gov/opinions/pdf/1031114.pdf

[24] 115 Wn.2d 34, 793 P.2d 952 (1990).

does not somehow obviate or reduce the ordinary duty of reasonable care to ensure one's own conduct does not harm another. For this reason, we decline to apply *Melville* to add a physical harm requirement to the objective symptomatology element of negligent infliction of emotional distress in all cases involving the Department.

The Department's argument that permitting the plaintiffs to bring a claim for emotional distress damages will "override [its] ability to safely manage its prisons" does not persuade us otherwise. Resp't's Br. at 38. The Department is correct that it has broad authority to discipline incarcerated people and a duty to keep its prisons safe by making efforts to prevent the introduction of controlled substances. And a certain amount of emotional distress is an unavoidable byproduct of life in prison. We agree that permitting negligence claims every time an incarcerated person has experienced severe emotional distress as a result of prison discipline would unreasonably restrict the Department's ability to safely manage its prisons.

But the specific circumstances the plaintiffs describe here go beyond the sort of ordinary "incidents of prison life" that the Department contends can never support a claim for emotional damages. Resp't's Br. at 38. The plaintiffs allege that the Department was aware that colorimetric tests are highly unreliable and regularly produced false positives, was misusing the tests by swabbing them on paper and other belongings rather than the powdered substances they were designed for, was allowing corrections officers to use highly unreliable colorimetric tests to retaliate against inmates, and refused requests for confirmatory testing before imposing punishments such as solitary confinement and reduction in good time credits, resulting in the delayed release dates. It is conceivable that the Department knew these actions were likely to cause severe emotional distress in some cases.

Placement in solitary confinement for disciplinary reasons is not automatically tortious just because it is likely to cause emotional distress, objectively diagnosable mental health problems, and even physical symptoms. But the specific *manner* in which the Department allegedly imposed discipline here could support a claim for negligent infliction of emotional distress if the plaintiffs can prove the allegations asserted in the complaint. Such allegations are all that is necessary to survive a CR 12(c) motion to dismiss. And in any case, as explained above, the plaintiffs have also alleged the physical harm that the Department incorrectly believes is required. We hold that it was error to dismiss the plaintiffs' claim for negligent infliction of emotional distress in these unique circumstances.

## V. AVAILABILITY OF CONSTITUTIONAL DAMAGES

The plaintiffs ask us to recognize an implied cause of action for damages against the Department for violations of the state constitution. They claim that at least seven other states have done so, at least for certain constitutional violations, especially when "other avenues to damages . . . remain unavailable." Appellants' Opening Br. at 53.[25] The plaintiffs note that Washington courts have previously deferred ruling on the issue of whether there can be a cause of action for state constitutional damages. They argue that if we reach this issue, we should hold that such an action exists because the plaintiffs have "provided a reasoned and principled basis" for it. Appellants' Opening Br. at 63.

---

[25] The plaintiffs contend that those states are Connecticut, Maryland, New Jersey, New York, North Carolina, Michigan, and Nevada.

The Department responds that neither the state constitution nor the legislature has "provided any method by which individuals may seek damages against the State for state constitutional violations." Resp't's Br. at 19.

We decline to recognize a cause of action for damages based on the alleged constitutional violations at this time.

A.      Due Process

This court has already held that the due process clause of the Washington State Constitution, absent "augmenting legislation," does not "establish a cause of action for money damages against the state." *Spurrell v. Bloch*, 40 Wn. App. 854, 862, 701 P.2d 529 (1985). Therefore, the plaintiffs cannot bring a claim for damages based on their allegation that the Department violated their right to due process under current law.

B.      Cruel Punishment

Washington courts have never directly ruled on whether the cruel punishment clause of the Washington State Constitution supports a damages claim, but the Washington Supreme Court has addressed other provisions of the state constitution.

In *Reid v. Pierce County*, the Washington Supreme Court evaluated whether plaintiffs should be permitted to bring an action for damages based on a violation of article I, section 7 of the Washington State Constitution, which protects the right to privacy. 136 Wn.2d 195, 213, 961 P.2d 333 (1998). Having already held that the plaintiffs' alleged facts were sufficient to make out common-law invasion of privacy tort claim based on the same conduct, the court explicitly reserved the issue:

> We feel, at this time, that Plaintiffs may obtain adequate relief under the common
> law and that such actions are better addressed under the common law invasion of

privacy action. Plaintiffs have not presented a reasoned or principled basis upon which to construct a constitutional cause of action, nor have they established why a constitutional cause of action is more appropriate than the common law cause of action which already exists. Because we hold Plaintiffs are entitled to maintain an action for invasion of privacy under the common law, we decline to reach this issue in this case.

*Id.* at 213-14.

Similarly, in *Blinka v. Wash. State Bar Ass'n*, Division One of this court declined to recognize a cause of action for damages for violations of article I, section 5 of the Washington State Constitution, which protects freedom of speech. 109 Wn. App. 575, 591, 36 P.3d 1094 (2001). The court reasoned that without legislative guidance, the court is in a "'poor position'" to determine "'what limitations on liability should be imposed'" for constitutional violations. *Id.* (quoting *Hunter v. City of Eugene*, 309 Or. 298, 303-04, 787 P.2d 881 (1990)).

We lack legislative guidance as to the contours of the plaintiffs' proposed constitutional action for damages. And the plaintiffs have acknowledged that the tort claims through which they seek damages would be an adequate remedy.

Following the *Reid* court's lead, we decline to rule on the question of whether there is a constitutional cause of action for damages for violations of the cruel punishment clause because the plaintiffs currently have an adequate remedy at law in the form of their common-law tort claims and we lack legislative guidance on the limitations of such a claim.[26]

---

[26] Because we need not decide whether constitutional damages are available due to the continuing viability of the plaintiffs' common-law tort claims, we do not address the Department's argument that any potential claim for constitutional damages would be barred by sovereign immunity because constitutional violations require a state actor.

VI. TRIAL COURT'S DECISIONS TO DEFER CLASS CERTIFICATION AND STAY DISCOVERY

Finally, the plaintiffs contend that the trial court abused its discretion in two ways: by deferring class certification and inviting the Department to bring a dispositive motion for judgment on the pleadings, and by staying discovery until it ruled on the dispositive motion. They argue that while the trial court may have discretion to defer ruling on class certification until it hears dispositive motions, it cannot defer ruling in order to *invite* a dispositive motion.

We review a decision to stay proceedings for abuse of discretion. *King v. Olympic Pipeline Co.*, 104 Wn. App. 338, 348, 16 P.3d 45 (2000). "A trial court abuses its discretion when its decision 'is manifestly unreasonable or based upon untenable grounds or reasons.'" *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010) (quoting *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)). "[A] trial court retains discretion, for purposes of judicial economy, to delay ruling on a motion for class certification until after hearing dispositive motions." *Sheehan v. Cent. Puget Sound Reg'l Transit Auth.*, 155 Wn.2d 790, 807, 123 P.3d 88 (2005). "Whether a court abuses its discretion in controlling discovery depends on the interests affected and the reasons for and against the decision." *King*, 104 Wn. App. at 348.

Here, in the Department's opposition to the plaintiffs' motion to certify the class, the Department argued that only a PRP, and not a class action lawsuit, was an acceptable avenue for the plaintiffs' claims. The plaintiffs responded by referring to this argument as a "de facto motion to dismiss" and explained to the court that it did not respond to the issue in its reply because it lacked space to do so after addressing the class action requirements of CR 23. 2 VRP at 76. The trial court invited the Department to bring a proper motion to dismiss so that the plaintiffs would have a full opportunity to respond. The plaintiffs acknowledge that trial courts are generally

permitted to defer ruling on class certification to hear dispositive motions, and the trial court's invitation provided the plaintiffs with an opportunity to fully respond to the Department's argument. The trial court did not abuse its discretion.

Similarly, we hold that the trial court did not abuse its discretion when it stayed discovery. Significant discovery had already been completed at the time of the stay. The trial court issued the stay because the plaintiffs would not need additional discovery to adequately respond. It is reasonable for a trial court to stay discovery in advance of a CR 12(c) motion, which is a legal motion determined on the pleadings. *See Long v. Snoqualmie Gaming Comm'n*, 7 Wn. App. 2d 672, 690, 435 P.3d 339 (2019) (trial court did not abuse its discretion when it "stay[ed] discovery pending a determination about immunity from suit," which in that case could "be determined on the basis of the law"). Therefore, the stay was not an abuse of discretion.

CONCLUSION

We affirm the trial court's order dismissing the plaintiffs' constitutional damages claims under CR 12(b)(6) and the trial court's decisions to defer class certification and stay discovery. We otherwise reverse and remand to the trial court for further proceedings consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

LEE, J.

VELJACIC, A.C.J